# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

In re:
**Stanocola Employees Medical and Hospital Association**
**Debtor**

**CASE NO. 01-11734**
**CHAPTER 11**

---

### STANOCOLA EMPLOYEES MEDICAL AND HOSPITAL ASSOCIATION, INC.
### SECOND AMENDED DISCLOSURE STATEMENT
### DATED APRIL 10, 2002

    **COMES NOW,** Stanocola Employees Medical and Hospital Association Inc., Debtor and Debtor-in-Possession, herein, who hereby proposes the following Second Amended Disclosure Statement pursuant to §1125 of Title 11 of the United States Code, and states as follows:

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | **Introduction** | **4** |
| | A. Summary of the Plan of Reorganization | 4 |
| | B. Voting Procedure | 4 |
| | C. Purpose of the Disclosure Statement | 5 |
| | D. Confirmation Hearing | 5 |
| | E. Disclaimers | 6 |
| II. | **General Information** | **7** |
| | A. Historical Background | 7 |
| | B. Ownership and Management | 8 |
| | C. Significant Pre-Petition Events | 9 |
| | D. Significant Post-Petition Events | 9 |
| III. | **Liquidation Analysis** | **12** |
| | A. Net Liquidation Proceeds | 12 |
| | B. Tax Attributes Upon Confirmation Under Chapter 11 | 13 |
| | C. Tax Attributes Upon Conversion to Chapter 7 | 13 |
| | D. Liquidation Analysis Conclusion | 13 |
| IV. | **Summary of Claims and Assets** | **13** |
| | A. Claims and Assets | 13 |
| | 1. Estimated Claims | 13 |
| | 2. Estimated Assets | 14 |
| | B. Income Analysis | 16 |
| | C. Cash Flow Projections | 16 |
| V. | **Summary of Plan of Reorganization** | **16** |
| | A. Classification and Treatment of Claims | 17 |
| | 1. Administrative Expense Claims | 17 |
| | 2. Priority Claims | 17 |
| | 3. Secured Claims | 17 |
| | 4. Convenience Class Claims | 18 |
| | 5. Unsecured Claims | 18 |
| | B. Executory Contracts and Unexpired Leases | 19 |
| | C. Miscellaneous Provisions | 20 |
| | D. Means of Execution and Implementation of the Plan | 20 |
| VI. | **Tax Consequences of the Plan** | **21** |
| | A. Tax Consequences to Holders of Claims | 21 |
| | B. Tax Consequences to the Debtor | 22 |
| VII. | **Confirmation Standards** | **22** |
| | A. Acceptance | 22 |
| | B. Feasibility | 22 |
| | C. Best Interests | 23 |
| | D. Good Faith Requirement | 23 |

VIII.   **Alternatives to the Plan**                                      **23**
        A. Dismissal of Case                                             **23**
        B. Conversion of Case to Chapter 7 of the Code                   **23**

IX.     **Conclusion and Recommendation**                                **23**

X.      **Exhibits**
        A. **Plan of Reorganization**
        B. **Balance Sheet**
        C. **Income Statement**
        D. **Monthly Projected Budget**
        E. **Projected Annual Budget**
        F. **Monthly Statement of Cash Flow**
        G. **Annual Statement of Cash Flow**

# I. INTRODUCTION

On July 20, 2001, Stanocola Employees Medical and Hospital Association, Inc., (hereinafter "Debtor", or "Stanocola", or "Clinic"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"), in the United States Bankruptcy Court for the Middle District of Louisiana (the "Court"). This Disclosure Statement ("Disclosure Statement") was prepared by the Debtor for use in soliciting, from all creditors, acceptances of the Debtor's Second Amended Plan of Reorganization, a copy of which is attached hereto as Exhibit "A" ("the Plan").

For the purposes of this Disclosure Statement, and any subsequent amendments, or modification hereof, the terms defined in the Plan, shall have the same meanings herein, and a term not defined in the Plan shall have the meaning set forth in the Code, if any. With respect to any inconsistencies between the Disclosure Statement and the Plan, the Plan shall control. All exhibits to the Disclosure Statement are incorporated into and made a part of the Disclosure Statement.

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor's background and financial condition have been prepared from information furnished by the Debtor, the Debtor's Schedules and Statement of Affairs, the Debtor's Monthly Operating Reports, and other pleadings filed by the Debtor, creditors, or other parties-in-interest in this bankruptcy case.

## A. Summary of the Plan of Reorganization

The Debtor's Second Amended Plan of Reorganization dated April 10, 2002, provides for full payment of all administrative expenses and the partial payment of all other creditors through continued operations of the business. Stanocola also intends to use the funds currently held in the 457 Deferred Compensation Plan to fund said administrative expenses, operating expenses and payments to creditors. Based upon the 457 Plan language and statutory and case law, Stanocola believes that said funds are property of the bankruptcy estate. Any party wishing to contest this position is advised to immediately seek legal counsel with regard to rights and remedies available. The Plan provides that unsecured claims will be paid a portion of their allowed claim. Secured claims will be paid in full, with interest, at the rate provided for in their agreements and/or financing documents. The Debtor estimates that proceeds from its business will be sufficient to make prescribed Plan payments to all creditors. This Disclosure Statement contains a detailed discussion of the Plan and its implementation together with projections of income and expenses, and should be read in conjunction with the Plan. The Plan is a legal document, which will, upon confirmation be binding on all parties. The Debtor urges all creditors and parties-in-interest to consult with independent counsel in connection with their decision to accept or reject the Plan.

## B. Voting Procedure

Creditors holding Allowed Claims, as that term is defined in the Plan, are entitled to vote to accept or reject the Debtor's Second Amended Plan of Reorganization. In voting to accept or reject the Plan, please fill out only the Official Ballot, which has been approved by the Court, and is provided herewith. **All ballots must be received by Debtor's counsel at the address below by a date to be fixed by the Court. Unless the Court orders otherwise, no vote received after such date will be counted in determining whether the Plan should be**

**confirmed.** Notice of such date will be given. Additionally, once a ballot has been submitted, it cannot be withdrawn or modified, except as allowed under the Code and/or Rules.

Even though a creditor may choose not to vote or may vote against the Plan, the creditors will be bound by the terms and treatment set forth in the Plan, if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court. Allowance of a claim or interest for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the Plan. All holders of allowed claims and interests who are entitled to vote are therefore urged to complete, date, sign and promptly mail the enclosed ballot to:

>Mr. Arthur A. Vingiello
>Steffes, Vingiello & McKenzie, L.L.C.
>3029 S. Sherwood Forest Blvd.
>Suite 100
>Baton Rouge, LA 70816

In order for the Plan to be deemed accepted by the class of creditors, the holders of voted claims in that class aggregating at least two-thirds (2/3) in the dollar amount and more than one-half (1/2) in the total number of allowed claims of creditors voting on the Plan must accept the Plan. Under certain limited circumstances, more fully described in §1129(b) of the Code, the Court may confirm a plan notwithstanding the rejection thereof by more than one-third (1/3) in amount or one-half (1/2) in number of the creditors voting on the Plan in any given class. The Debtor intends to seek confirmation under §1129(b) of the Code in the event that any class of creditors rejects the Plan.

## C.    Purpose of the Disclosure Statement

Pursuant to the terms of the Code, the Debtor may not solicit support of its Plan, unless at the time of, or prior to solicitation, there is transmitted to the holders of claims and interests: (1) a copy or summary of the Plan, and (2) a written Disclosure Statement which has been approved by the Court as containing information of a kind, and in sufficient detail, to enable a typical creditor to make an informed judgement in whether to vote to accept or reject the Plan. The Debtor has prepared this Disclosure Statement to disclose that information, which, in its opinion, is necessary for the average creditor to make such an informed evaluation of the Plan. The Debtor believes that this Disclosure Statement complies with the provisions of 11 U.S.C. §1125, as well as Rule 3016-2 of the Local Bankruptcy Rules for the Middle District of Louisiana. The Court has approved this Disclosure Statement as containing such adequate and sufficient information.

## D.    Confirmation Hearing

The Court has set a hearing to determine whether or not the Plan has been accepted by the requisite number of holders of claims and interest, and whether or not all other confirmation requirements have been satisfied before the Honorable Louis M. Phillips, United States Bankruptcy Judge, at the United States Bankruptcy Court, 707 Florida Street, Baton Rouge, Louisiana, ("Confirmation Hearing"). Notice of the date of such hearing shall be given. The Confirmation Hearing may be adjourned from time to time without further written notice to parties other than an announcement in open court. Any objection to confirmation must be made, in writing, and specify, in detail, the name and address of the objecting party, all grounds for the objection, and the amount of the claim against or a description of the interest in the Debtor held

by the objecting party. Any such objections must be filed with the Court, and served on all parties entitled to notice in the bankruptcy case, by a date, which shall be fixed by the Court.

## E.    Disclaimers

THE DEBTOR IS PROVIDING THIS DISCLOSURE STATEMENT TO ALL KNOWN HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR FOR THE PURPOSE OF DISCLOSING ADEQUATE INFORMATION SO THAT SUCH HOLDERS MAY EVALUATE THE PLAN AND ARRIVE AT AN INFORMED JUDGEMENT AS TO THEIR RIGHTS TO VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PUROSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NOTHING CONTAINED HEREIN SHALL (1) CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (2) BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR (3) BE DEEMED CONCLUSIVE ADVICE AS TO THE LEGAL EFFECTS OF REORGANIZATION OR LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS OR INTERESTS.

NO REPRESENTATIONS OR STATEMENTS BY ANY PERSON CONCERNING THE DEBTOR, THE DEBTOR'S BUSINESS OPERATIONS, OR THE VALUE OF THE DEBTOR'S ASSETS ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, OTHER THAN THOSE CONTAINED IN THIS STATEMENT OR AS OTHERWISE APPROVED BY THE BANKRUPTCY COURT. ANY OTHER PERSON MAKING REPRESENTATIONS OR INDUCEMENTS CONCERNING ACCEPTANCE OR REJECTION OF THE PLAN SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR AT THE ABOVE ADDRESS AND TO THE UNITED STATES TRUSTEE, WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS THE COURT DEEMS APPROPRIATE.

DUE TO THE COMPLEXITY OF THE DEBTOR'S FINANCIAL AFFAIRS AND FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT AND ANY ATTACHMENTS HERETO, YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL ADVISOR, TAX ADVISOR, AND/OR LEGAL COUNSEL TO FULLY UNDERSTAND THE PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT. YOU MAY NOT UNDERSTAND ALL OF THE FINANCIAL INFORMATION PRESENTED WITHOUT ASSISTANCE FROM YOUR FINANCIAL ADVISOR. YOU MAY NOT FULLY UNDERSTAND ALL OF THE TAX CONSEQUENCES AND IMPLICATIONS OF A VOTE TO ACCEPT OR REJECT A PLAN WITHOUT THE ASSISTANCE FROM YOUR TAX ADVISOR. YOU MAY NOT FULLY UNDERSTAND ALL OF THE LEGAL CONSEQUENCES AND IMPLICATIONS OF A VOTE TO ACCEPT OR REJECT THE PLAN WITHOUT ASSISTANCE FROM YOUR LEGAL COUNSEL.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY ATTACHMENTS. WHILE EVERY EFFORT HAS BEEN MADE TO PROVIDE THE MOST ACCURATE INFORMATION AVAILABLE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL INFORMATION IS WITHOUT INACCURACY OR OMISSION. FURTHERMORE, MUCH OF THE INFORMATION CONTAINED HEREIN CONSISTS OF PROJECTIONS OF FUTURE PERFORMANCE OF A VERY COMPLICATED AND UNCERTAIN BUSINESS. WHILE EVERY EFFORT HAS BEEN MADE TO INSURE THAT THE ASSUMPTIONS ARE VALID AND THAT THE PROJECTIONS ARE AS ACCURATE AS CAN BE MADE UNDER THE CIRCUMSTANCES, THE DEBTOR DOES NOT UNDERTAKE TO CERTIFY OR WARRANT THE ABSOLUTE ACCURACY OF THE PROJECTIONS.

NO FORMAL APPRAISALS HAVE BEEN UNDERTAKEN OF THE DEBTOR'S PROPERTY. THE VALUE PLACED THEREON AND SUMMARIZED BELOW ARE THE DEBTOR-IN-POSSESSION'S BEST ESTIMATE OF THE VALUES OF THE PROPERTY AS OF THE TIME OF THE FILING OF THE PLAN OF REORGANIZATION AND THIS DISCLOSURE STATEMENT. THESE VALUES MAY DIFFER FROM VALUES PLACED ON THE SAME PROPERTY AT THE TIME OF THE FILING OF THE PETITION FOR RELIEF AND THE SUBSEQUENT SCHEDULES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHMENTS HERETO ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS PREPARED.

## II. GENERAL INFORMATION

### A.    Historical Background

Stanocola Employees Medical and Hospital Association, Inc., opened its doors in 1924 as the creation of a project of Standard Oil Company of Louisiana to provide healthcare services for the employees and dependents of that company. The original clinic was located on North Street, with a donated building, which was staffed by two physicians. The purpose of the clinic was to provide all of the medical needs of the employees and their dependents for one price.

Originally, the clinic was operated as a department of the refinery. In 1931, it was incorporated as a separate Not-For-Profit corporation, which it still is today, operating under Section 501(c)(3) of the Internal Revenue Code. The Board of Directors was elected from the Standard Oil workforce.

In the 1950's, Stanocola created a dues-paying plan. This was in response to large layoffs occurring at the refinery, which left many employees without healthcare. The OTC program allowed patients to receive healthcare services through Stanocola for a small monthly fee and a per-visit copay. The clinic moved into a new facility on North Foster in 1956.

With the institution of the Medicare Program in the 1960's, Stanocola created a new membership class to incorporate Medicare patients.

In the mid-1970's, Blue Cross created a product called HMP and used the clinic as a base to market a managed care type plan to employer groups.

In 1985, Stanocola Home Health was opened to provide services to patients in a 13-parish area. Blue Cross folded its HMP product in 1988, leaving many of Stanocola's patients without a health plan. This led Stanocola to become a provider with CIGNA Health Plan, the beginning of Stanocola's participation with insurers in many HMO, POS and PPO plans in the community.

In 1997, Stanocola opened a satellite office in the O'Neal Lane area at Physicians Plaza I, 16777 Medical Center Drive. In the late 1990's, a decision was made to relocate the "main clinic" to the O'Neal Lane campus, and maintain a satellite at the North Foster location. Early in 2001, departments began relocation. The financial difficulties being experienced by the clinic prompted the decision in May 2001 to close the North Foster Clinic and the Primary Care office

at the Hennessy location. The remainder of the move from North Foster to Medical Center Drive was completed February, 2002.

Today, Stanocola serves over 36,000 patients in the Baton Rouge metropolitan area and surrounding parishes. Almost twenty percent (20%) of the patients are senior citizens. Stanocola also participates in Medicaid and grants special financial consideration to hardship cases, on an individual basis, to help citizens obtain needed services. Stanocola also provides services to the community's underinsured workforce as a provider for the Baton Rouge Community Clinic program.

The professional services available at Stanocola include:

|   |   |
|---|---|
| . Primary Care | . Podiatry |
| . Internal Medicine | . Physiatry |
| . Pediatrics | . Surgery |
| . Allergy | . Radiology |
| . Rheumatology | . OB/GYN |
| . Immunology | . Ophthalmology |
| . ENT | . Optometry |
| . Cardiology | . Pharmacy |
| . Dermatology | . Lab |
| . Gastroenterology | . Dietary Counseling |

In addition, our Patient Education programs include, but are not limited to, Diabetes Control, Breast Care, and Anticoagulation Management. Many of these programs are non-billable services, but are important to positive long-term patient outcome.

Stanocola's Home Health Agency provides approximately 1,500 visits per month. Services provided include:

|   |   |
|---|---|
| . Nursing Care | . Home Health Aides |
| . Physical Therapy | . Occupational Therapy |
| . Speech Therapy | . Social Work |
| . Dietary Counseling | |

Stanocola Home Health works with other providers in the community with such programs as:

|   |   |
|---|---|
| . Post CABG Surgery Care | . Post Total Hip Surgery Care |
| . Post Knee Replacement Surgery Care | . Home Sight |

## B.    Ownership and Management

Stanocola is a 501(c)(3) Not-For-Profit corporation. Its Board is comprised of eleven (11) Directors, which are elected from the Stanocola Membership as prescribed by the Articles and By-Laws. Stanocola has operated as a Not-For-Profit corporation since 1931. The Debtor is managed by its Chief Executive Officer (CEO), Ledoux J. Chastant, III, who has been the CEO for eighteen (18) years. The Clinic's Chief Financial Officer (CFO) is Wanda M. Allphin. Ms. Allphin has worked with the Clinic in a financial capacity for four and half- (4 ½) years.

## C.    Significant Pre-Petition Events

Many factors have had a negative effect, financially, on the entire, local healthcare provider community.  In the last four (4) years, ten insurers and/or managed care products have either dissolved, merged or gone out of business in our area.  This trend began with Advantage Health Plan in 1998, and most recently, with Gulf South Health Plans in May 2001.  At the time Gulf South ceased business, it was, then, the Clinic's largest payor, paying the Clinic both on a capitated and fee-for-service basis.  The demise of Gulf South Health Plans placed an economic hardship on Stanocola.  This resulted in the abrupt cessation of $200,000.00, per month, in capitation monies alone.  The capitation was an especially crucial blow to the Clinic.  Not only did it create a large vacuum in the Clinic's monthly cash flow, but also affected the Clinic's profitability.  Therefore, the net effect was negative to both cash flow and profitability.  In addition, over half a million dollars of accrued, outstanding claims were not paid.

The trend of slow or non-payment of claims by insurance carriers have led to cash flow problems and effected most health care providers in the community.  In fact, the problem has become so acute; the State Legislature recently passed "Prompt Pay" legislation.  Unfortunately, it is only now that the full implementation of the "Prompt Pay" legislation is being effective in the Louisiana HMO community.  Stanocola has been no exception.  Slow or non-payment of claims from a multitude of payors had created a cash flow problem, even prior to the demise of Gulf South Health Plans.

Another negative factor was Stanocola's Home Health operations.  The Home Health industry has experienced three major reimbursement changes in the last two years.  These reimbursement changes in the Home Health industry have caused fifty percent (50%) of Home Health Agencies in the United States to cease doing business.  These changes have also contributed to the pre-petition financial condition of Debtor.  In October of 2000, PPS payment plan became effective creating disruption in Home Health cash flow.

Several additional factors have played a part in Stanocola's situation.  To become Y2K compliant, Stanocola underwent a necessary, but expensive, computer conversion.  To further Stanocola's difficulties, the locally owned software company that Stanocola selected for support was purchased by their out-of-state Corporate Office, which resulted in the loss of several key personnel.  One of the main reasons Stanocola selected this vendor was because of its expertise and personnel at a local level.  Suddenly, Stanocola was being supported by a vendor unfamiliar with the local billing requirements and Stanocola's custom-designed programs.  As a result, the conversion was prolonged, creating major billing issues throughout the later half of 1999 and the first half of 2000.

In April of 2001, the diagnosis of a terminal illness for Dr. Allen Guthrie, a long-time and very popular Primary Care Physician, and his subsequent death in July, created a major disruption in Primary Care services to Stanocola patients.

## D.    Significant Post-Petition Events

Shortly after filing the captioned case, Stanocola was authorized by the Bankruptcy Court to provide a draw against future earnings to all employees, equal to the employees' payroll, not to exceed the payroll which would ordinarily be paid on July 27, 2001, including expense reimbursement and payroll deductions.  This occurred because, under the Bankruptcy Code, Stanocola was prohibited from paying this prepetition payroll.  This draw was provided to the employees and, upon the Effective Date of the Plan, will be offset against the subject payroll

owed to the employees to the extent that such payroll constitutes a priority under Section 507 (a)(3) of the Bankruptcy Code.

In the time that has lapsed since the filing of the petition, the clinic has been very active in efforts to reduce costs, increase cash flow and generate additional revenues. While developing these activities, the clinic also had two additional hurdles to overcome. The clinic's health insurance, which at the time was carried by The Oath, was up for renewal. The initial rates were projected to be an increase of over 70%, which would have created a significant budget item. Through negotiations and working closely with other providers, the clinic has secured coverage from Blue Cross Blue Shield of LA. The clinic was able to defray a significant amount of the $15,000 per month additional premium by asking employees to defray some of the clinic's increase with additional contributions.

The second significant hurdle was September 2001. September operations were effected by two factors: (1) the events of September 11 and (2) the move from North Foster to O'Neal. It was obvious how the September 11 events affected the country as a whole. Just as significant to us, the effect on our business was devastating. The gross billing for August was $1.57 million dollars, as compared to September at $1.28 million dollars – a $290,000 reduction in gross billings. Fortunately, the billings for October have recovered and were reported at $1.65 million dollars. While we think both of these factors were significant to the clinic's operations at the time, we do believe that these were one-time factors. While they created a hardship at the time, we feel that the long-term impact of these factors should be insignificant to the Clinic.

The second factor was the consolidation of the clinic's multiple operations into the two sites. This has been accomplished by moving the primary care office at Hennessy and North Foster to the O'Neal Lane site. Stanocola now consists of a large operation at O'Neal Lane and the OB/GYN office, which will remain in the Goodwood Boulevard area near Woman's Hospital. The lease of the O'Neal Lane site was approved by the Court, post-petition after notice to creditors and a hearing.

Dr. James Doll, Allergist/Rheumatologist who has worked for Stanocola as a part-time practitioner for many years, closed his private practice in July to become a full-time Stanocola physician. These consolidations reduced the clinic's over-head cost over the long term, however, in the short run, it was necessary to experience additional moving expense and the clinic's business was interrupted for several months during the move.

In addition to operating costs, the clinic has also been successful in reducing other significant costs particularly, payroll costs. This has been accomplished by reducing the payroll on an average of $40,000 per payroll (every two weeks). This will be effective beginning November 2001. Stanocola also converted the life and disability benefits from an employer to an employee funded benefit.

Stanocola sponsors a pension plan, which was frozen in August, 2001, The Retirement Plan for Employees of Stanocola Employees Medical and Hospital Association, Inc. (the "Pension Plan"), which is covered by the insurance program of Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), administered by the Pension Benefit Guaranty Corporation ("PBGC"). PBGC is a wholly-owned U.S. government corporation that guarantees payment of certain pension benefits upon termination of a covered pension plan.

The Pension Plan is underfunded by approximately $5,000,000. An underfunded pension plan may be terminated in a "distress termination" if the requirements of 29 U.S.C. §1341(c) are

met. The management and Board of Stanocola believe the Pension Plan meets the criteria for a distress termination and will request authorization from the Bankruptcy Court for such termination.

Because of the Pension Plan termination, Stanocola will be liable to the PBGC for the amount of unfunded benefit liabilities as of the termination date according to 29 U.S. C. §1362(b). Stanocola will be liable to the Pension Plan and PBGC for any unpaid minimum funding contributions under 29 U.S.C. §1362(c); 26 U.S.C. §412. Stanocola is also liable to PBGC for any unpaid premiums. 29 U.S.C. §1307. As of the date of this Disclosure Statement, there are currently no unpaid premiums. PBGC will file claims for these estimated and contingent liabilities.

If the Pension Plan is not terminated on or before the Effective Date of the Plan of Reorganization, Debtor's liabilities to the PBGC for unfunded benefit liabilities and for unpaid minimum funding contributions do not arise and, accordingly, are not discharged, released, or enjoined.

Another area of focus has been improving cash flow. There has been a major effort to clean up the Clinic's account receivable. Roedel Parsons, a local law firm that specializes in collection of healthcare debt, has been retained as special counsel for that purpose. Also, now that the state law for timely payment is in full effect, Stanocola is beginning to see the benefits of increased collection from HMO payors.

With the loss of much of the capitation payments, particularly through Gulf South's demise, Stanocola had to focus on new services with higher profitability. Stanocola has concentrated its efforts on bringing new sources of revenue and profitability to the organization. Gulf Coast Research has recently generated its first contract with Stanocola to provide research services to the pharmaceutical industry. Also recently negotiated, was a contract with Blue Cross Blue Shield of LA. Under this newly negotiated contract, all of Stanocola's services will be open to all of Blue Cross patients regardless of the Blue Cross product. Stanocola is now one of the few Baton Rouge providers on virtually all insurance plans.

Stanocola's Dermatology Department has begun to provide cosmetic services along with the traditional medical services. This will generate not only a new source of revenue but also a large cash base service, which should serve to create, profits as well as position cash flow.

Stanocola's Home Health Department is now one year out of the implementation of PPS, which was the last major reimbursement change from Medicare for home health agencies. Now with one year of PPS behind the clinic, the Home Health Department, has not only stabilized, but has begun once again to show a positive contribution margin towards the clinic's operations. To further enhance the profitability of Home Health, Stanocola has recently negotiated and signed a contract with Home Site, which is a home care program for patients with low vision to assist them in their daily life. There are only two home health agencies in Baton Rouge that will be available to provide this program. Training for Stanocola's Home Health staff began in November.

Stanocola has begun to provide new cardiology services. These services will enhance the diagnostic capabilities of Stanocola's cardiologists. In the first couple months of operations, these new services have generated approximately $12,000 additional billings per month.

The debtor has been cautious in its projections for both expense and revenue as it considers the nature of the healthcare business. There is still concern in the healthcare business community as to the viability of all the current insurance carriers. Given the most recent history and the present situation, it would be prudent for all healthcare providers to be diligent in watching the events over the next couple of years as it pertains to insurance payors.

In addition, the Medicare conversion factor was reduced for the year 2002. The effect is a general reduction of approximately five percent (5%) of the Medicare reimbursement to providers for the year 2002. While there is currently a bill in Congress to repeal this reduction, there is no way of knowing the final outcome at the present time. Therefore, consideration must be given to account for the production in Medicare revenues.

Another area of concern is implementation of regulations as they begin to unfold over the next several years. Anticipating the cost for implementing regulations such as HIPPA, Stark II, and other pending regulations requires a conservative approach.

Upon finalizing the move from North Foster to O'Neal in February, and because of the inability of the radiology provider to provide equipment as originally agreed upon, Stanocola was left without radiology equipment and services. The purchase of X-ray equipment was authorized by the Bankruptcy Court after notice and hearing. The net result, now that Stanocola is able to provide radiology services in-house, is an estimated savings of approximately $15,000 per month.

During April, 2002, Stanocola will move the OB/GYN operations to share office space with another OB/GYN physician group. In addition, Stanocola will narrow the number of part-time contract OB/GYN physicians and execute a new contract with the remaining physicians. This action will create a savings of approximately $12,000 per month. Patient care will also be enhanced by the additional services offered at the new location

## III.  LIQUIDATION ANALYSIS

### A.  Net Liquidation Proceeds

The Debtor estimates that the net liquidation value, after payment of the costs of sale, of the furniture and equipment is $259,000, and inventory is $100,000.00. These values are only an estimate made by the Debtor, based on its knowledge of the industry. As of the Confirmation Date, Debtor estimates that it will have $651,000 in cash that consists of cash and funds held in the 457 Deferred Compensation Plan. As of the Confirmation Date, Debtor estimates that it will have accounts receivable of approximately $840,000.00. Additionally, Debtor owns a Certificate of Deposit in the amount of $100,000, which is being used as security for its debt to Union Planters Bank. This results in total available liquidation proceeds of $1,950,000.00.

**Total Liquidation Proceeds**                         **$1,950,000.00**

The following creditors have secured or priority claims in the amounts shown below, to wit:

| | |
|---|---|
| Union Planters Bank | $315,000.00 |
| Union Planters Bank | $496,000.00 |
| Bayou Federal Credit Union | $ 19,000.00 |
| Administrative Expense Claims | $602,000.00 |
| Priority Tax Claims | $425,000.00 |
| **Total Secured, Administrative and Priority Claims** | **$1,857,000.00** |
| **Net Available for Distribution to Unsecured Creditors** | **$ 93,000.00** |

As the majority of the Debtor's assets are encumbered by virtue of the security interests of Union Planters Bank and since the Debtor owns no real estate and many of the assets of the Debtor are specialty medical items, which has a very narrow resale market, any sale of these assets would produce little benefit to creditors of the Debtor, other than as listed above.

**B.    Tax Attributes Upon Confirmation Under Chapter 11**

The Debtor is a Not-For-Profit corporation as described in Section 501(c)(3) under the Internal Revenue Code (IRC) Section, and is exempt from federal income taxes on related income pursuant to Section 501(a) of the IRC. Confirmation of the Plan should not have any adverse effect regarding the Debtor's tax status.

**C.    Tax Attributes Upon Conversion to Chapter 7**

Conversion would have no adverse effect regarding the Debtor's tax status.

**D.    Liquidation Analysis Conclusion**

Based on the above liquidation analysis, under the Plan, each class of claims would receive at least that which would be received upon liquidation in a Chapter 7. In particular, the Debtor believes that the distributions to be made under the Plan will be greater than through a liquidating bankruptcy under Chapter 7 of the Code.

## IV.    SUMMARY OF CLAIMS AND ASSETS

**A.    Claims and Assets**

1. **Estimated Claims**. Below is the Debtor's summary of the estimated claims outstanding against the Debtor as of the date of this Disclosure Statement, including administrative expenses estimated as of the Confirmation Date. For the purposes of the analysis of the claims asserted, the Debtor has estimated the amounts it believes will be deemed allowed claims and interests in each class, but some claims filed exceed the amount that the Debtor's records reflect as being due and owing to such vendors. The Debtor will attempt to resolve these discrepancies through the claims objection process prior to the Confirmation Hearing.

a. **Administrative Expense Claims.** The total amount of administrative expense claims is estimated to be approximately $602,000.00 as of the Confirmation Date, and shall consist of the estimated claims of Steffes, Vingiello & McKenzie, L.L.C., for $20,000.00; Adams and Reese, L.L.P., for $10,000.00; Roedel, Parsons, Koch, Frost, Balhoff & McCollister for $12,000.00; and Hawthorn, Waymouth & Carroll, L.L.P., for $20,000.00, Schaneville, Baringer & Meltzer, L.L.C., for $18,000.00; Kean Miller, for $6,000.00; for services rendered in this bankruptcy case, the claim of the Office of the United States Trustee for ordinary quarterly fees, for $16,000.00, and current accounts payable expenses estimated at $500,000.

b. **Priority Claims.** The total amount of priority claims, including priority tax claims, is estimated to be approximately $425,000.00, which consists of the claims of $125,000 taxes to: (1) Louisiana Department of Revenue for withholding and state sales taxes; (2) Internal Revenue Services, for federal withholding taxes and excise taxes; (4) Parish of East Baton Rouge for parish sales tax, and $300,000 current payroll expense.

c. **Secured Claims.** The total amount of secured claims is approximately $830,000, which consists of the claims of Union Planters Bank, $811,000 secured by an interest in and upon equipment and accounts receivable of the Debtor and Bayou Federal Credit Union, $19,000 secured by a vehicle.

d. **Unsecured Claims.** The total of amount of unsecured claims, based upon a review of the Debtor's Schedules and Executory Contracts, is estimated to be approximately $8,000,000.00, including convenience claims. The largest of these are:

   1. PBGC estimated at $5,000,000.00;
   2. Baton Rouge Health System, LLC, Stanocola's former landlord, estimated at $890,000, which claim has been transferred to Quorum, Inc.;
   3. 457 Plan Participants estimated at $683,000.00;
   4. General trade creditors totaling approximately $1,450,000.00

e. **Convenience Claims.** The total amount of convenience claims, based upon a review of the Debtor's Schedules, is estimated to be approximately $70,000.00. This figure estimates all creditors holding general unsecured claims of $500.00 or less, and those who will elect to reduce their claims to $500.00 and be treated in the convenience class.

f. **Equity Interests.** Not applicable to 501(c)(3) Not-For-Profit organizations.

2. **Estimated Assets.** The total liquidation value of all the Debtor's assets as of the Confirmation Date is estimated to be approximately $1,950,000.00. The Debtor suggests that the values assigned to the assets below represent a fair estimate of the selling price if such assets were marketed over a reasonable period, and if a hypothetical willing buyer could be located.

a. **Furniture, Fixtures and Equipment.** The Debtor estimates that the fair market value of the furniture, fixtures, equipment and office equipment as of the Confirmation Date is approximately $259,000.00.

b. **Inventory.** The Debtor estimates that the fair market value of its inventory as of the Confirmation Date is approximately $100,000.00.

c. **Cash and Other Accounts.** The Debtor estimates that the fair market value of its cash and other reserve accounts as of the Confirmation Date is approximately $1,000.00.

d. **457 Plan.** The Debtor estimates the fair market value of its investments held in the 457 Plan as of the Confirmation Date is approximately $650,000. On information and belief, the Debtor has treated the funds in this plan as subject to the claims of creditors. Participants in this 457 Plan will be treated as general unsecured creditors under this Chapter 11 Plan and paid a portion of their allowed claim. **The distribution of 457 Plan payments to such 457 Plan participants may have significant tax effects to the recipients, and they are advised to seek tax counsel regarding the effect of any such distribution, as well as legal counsel regarding their right to file a claim and the necessity of filing such a claim.**

Distributions of $337,286 were made out of this 457 Plan within 90 days of the filing of Chapter 11. Debtor's view of this is that it is not a pre-petition preferential transfer as these distributions were done in the ordinary course of business. Likewise, Debtor does not intend to pursue any such claim.

e. **Certificate of Deposit.** The Debtor estimates the fair market value of its Certificate of Deposit to be approximately $100,000. Over the past several years, this Certificate has been pledged to LAMMICO, physician malpractice insurance, towards the deductible. Upon renewal, January 2002, Union Planters Bank took this collateral and did not renew the security to LAMMICO. The Debtor will request authorization to have this Certificate returned as pledged to LAMMICO, subject to the subordinate claim of Union Planters Bank.

f. **Accounts Receivable.** The Debtor estimates that the fair market value of its accounts receivable as of the Confirmation Date is approximately $840,000. This figure takes into account a thirty percent (30%) cost of collection

g. **Causes of Action.** The Debtor has claims against Gulf South Health Plans for outstanding receivables incurred in the ordinary course of the Debtor's business. It was anticipated that the resolution to the Gulf South receivables would have been determined by November 5, 2001, however, due to the delay in the hearing, the resolution to the Gulf South question will not be determined until 2002. The outcome of such liquidation will not significantly effect debtor's ability to make payments, as such receivables have not been factored into the debtor's

primary projections. However, the debtor dedicates any funds received from Gulf South, over and above the offset required in its executory contract, to be paid as an additional amount to Class 5, on a pro rata basis in the next quarterly scheduled payment after such monies are received.

Stanocola has been in discussion with The Oath HMO regarding handling and resolution of claims Stanocola has submitted to The Oath. The discussion revolves around the application of Stanocola's contract to the payment of claims, as well as other "Prompt Pay" issues. It is Stanocola's hope that these claims will be paid in the very near future. Alternately, Stanocola may be required to file an adversary proceeding against The Oath or other responsible parties.

## B.    Income Analysis

Pursuant to the Rules and Regulations promulgated by the United States Trustee's Office, the Debtor filed a complete Schedule of Assets and Liabilities and Statement of Affairs as of the Petition Date, as well as Monthly Operating Reports for each month since the Petition Date. The Schedules, Statements and Monthly Operating Reports may be reviewed and inspected by all interested persons. Copies may be obtained by writing to the Clerk of the United States Bankruptcy Court, Middle District of Louisiana, in Baton Rouge, Louisiana. A fee will be charged by the Clerk for such copies.

Attached, hereto, as "Exhibit B" is the Debtor's Balance Sheet, as Exhibit "C" is the Debtor's Income Statement. It should be noted that there is an apparent difference between this Income Statement and the Income Statement included in the Monthly Operating Reports. The Monthly Operating Report year-to-date figures are based upon the year beginning with the filing of petition, July 20; whereas, the Income Statement in Exhibit "C" uses Debtor's fiscal year, July first. The Debtor has prepared this information for the purposes of demonstrating current operations of the Debtor in connection with this Disclosure Statement.

## C.    Cash Flow Projections

Attached hereto as Exhibit "D" is the Debtor's Monthly Budget for February 2002 through October 2002, as Exhibit "E" is the Debtor's Annual Budgets, as Exhibit "F" is the Debtor's Monthly Statement of Cash Flows, and as Exhibit "G" is the Debtor's Annual Statement of Cash Flows. This information has been prepared by the Debtor for the purpose of demonstrating cash flow projections in connection with this Disclosure Statement.

# V. SUMMARY OF THE PLAN OF REORGANIZATION

THE FOLLOWING IS A BRIEF SUMMARY OF THE MATERIAL PROVISIONS OF THE PLAN AND THOSE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO, OR IN CONNECTION WITH, CONFIRMATION OF THE PLAN. THE SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF, OR A SUBSTITUTE FOR, A FULL AND COMPLETE READING OF THE PLAN, WHICH ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE URGED TO REVIEW CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING UPON THE DEBTOR, ALL HOLDERS OF CLAIMS AND INTERESTS AND ALL PARTIES IN INTEREST PURSUANT TO §1141 (A) OF THE CODE.

The overriding purpose of the Plan is to reorganize the Debtor's financial affairs, to provide for full payment of all secured claims and maximum payment on unsecured claims, and to facilitate patient care. The Plan, if confirmed, will be the sole vehicle for satisfying the rights of holders of claims against and interests in the Debtor.

## A.    Classification and Treatment of Claims

The Plan establishes various classes of claims and provides for the treatment of each according to its characterization. The Debtor believes that the classification of claims and interests provided by the Plan is consistent with the requirements of the Code. A brief description, qualified in all respects by references to the Plan itself, of each class and its proposed treatment under the Plan is set forth below.

1.    **Administrative Expense Claims.** Administrative Expense Claims shall not be classified, however, the Plan provides that holders of allowed administrative expense claims shall be paid, in full, within thirty (30) days of the Confirmation Date, out of current cash flow from operations and, to the extent necessary, with assets from the 457 Plan, or upon such other terms as may be agreed upon, in writing, between the holder of such claim and the Debtor; provided, however, any allowed administrative expense which is incurred in the ordinary course of business shall be paid when due in the ordinary course of business. The Plan further provides that any administrative expense claim allowed by the Court, after the Effective Date, shall be paid, in full, within thirty (30) days of the issuance of a Final Order of the Court allowing such claim, unless the holder of such claim consents, in writing, to a different treatment of its claim.

2.    **Priority Claims.** Allowed Priority Claims shall not be classified, however, the Plan provides that holders of allowed priority tax claims shall be paid, in full, in sixty (60) equal, monthly installments, beginning within thirty (30) days of the Effective Date, with interest at the appropriate statutory rate, unless the holder of such claim consents, in writing, to a different treatment of its claim. The Plan also provides that all other allowed priority claims shall be paid, in full, within thirty (30) days of the Effective Date, or upon such other terms as may be agreed upon, in writing, between the holder of such claim and the Debtor, and any claims allowed by the Court after the Confirmation Date shall be paid, in full, within thirty (30) days of the issuance of a Final Order of the Court allowing such claim, unless the holder of such claim consents, in writing, to a different treatment of its claim.

3.    **Class 1 Secured Claim (Union Planters Bank).** Class 1 shall consist of the Allowed Secured Claim of Union Planters Bank, which has a valid security interest in and upon certain equipment and accounts receivable of the Debtor. The Class 1 claim is estimated to be approximately $315,000.00 as of June, 2002, and shall be paid, with interest to accrue at the contractual rate, in monthly installments of $13,500.00 beginning on the fifteenth (15th) day of the first, full month after the Confirmation Date, and continue thereafter on the fifteenth (15th) day of each subsequent month until such claim is paid in full. The security interests of Union Planters Bank shall survive confirmation until such claim is

paid, in full, as provided under §506 of the Code. Class 1 is impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

4.    **Class 2 Secured Claim (Union Planters Bank).** Class 2 shall consist of the Allowed Secured Claim of Union Planters Bank, which has a valid security interest in and upon certain equipment and accounts receivable. The Class 2 claims are estimated to be approximately $496,000.00, as of June, 2002, and shall be paid, with interest to accrue at the contractual rate, in monthly installments of $4,500.00, beginning on the fifteenth (15th) day of the first full month after the Confirmation Date, and continue thereafter on the fifteenth (15th) day of each subsequent month until the Class 1 Secured Claim to Union Planters is paid in full. Then Class 2 payment will increase to $17,500.00 beginning on the fifteenth (15th) day of the first month after full payment of Class 1 until the Class 2 claim is paid in full. The security interests of Union Planters Bank shall survive confirmation until such claim is paid, in full, as provided under §506 of the Code. Class 2 is impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

5.    **Class 3 Secured Claim (Bayou Federal Credit Union).** Class 3 shall consist of the Allowed Secured Claim of Bayou Federal Credit Union, which has a valid security interest in and upon a certain vehicle, namely a 2000 Chevrolet Astro Van, vehicle identification number 1GNDM19W8YB136841. This Class 3 claim is estimated to be approximately $17,375.28, as of February, 2002 and shall continue to be paid, with interest to accrue at the contractual rate, in monthly installments of $422.22, on the fifteenth (15th) day of each month according to the terms of the original contract, and continue thereafter on the fifteenth (15th) day of each subsequent month until such claim is paid in full or contract option is exercised. The security interests of Bayou Federal Credit Union shall survive confirmation until such claim is paid in full, or contract option is exercised, as provided under §506 of the Code. Class 3 is not impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

6.    **Class 4 Unsecured Claims (Convenience Class).** Class 4 shall consist of all Allowed Unsecured Claims in an amount of $500.00, or less, and the Allowed Unsecured Claims of holders of Allowed Unsecured Claims that elect, in writing, to reduce their claims to $500.00 or less. Class 4 Claims shall be paid in full, without interest, on the Effective Date with funds provided by the 457 Plan. Class 4 is impaired under the Plan, and the holders of such claims are entitled to vote to accept or reject the Plan.

7.    **Class 5 Unsecured Claims (Claims Greater Than $500.00).** Class 5 shall consist of all Allowed Unsecured Claims of more than $500.00, exclusive of those holders who elect to be treated as Class 4 Claims. Class 5 Claims shall be paid a lump sum of $250,000 from the remaining 457 Plan assets 30 days after the Effective Date on a pro-rata basis. In addition, $100,000 annually will be paid in quarterly payments beginning with the first quarter in the year of 2003, to be paid on March 31, 2003 and continuing for a total of forty (40) quarters. In addition, the Debtor agrees that if there are to be any monies forthcoming from Gulf South, above and beyond the obligations in its executory contract, the Class 5 Debtor would get additional funds on a pro-rata basis in the next scheduled quarterly

payment after such monies are received. Class 5 is impaired under the Plan, and the holders of such claims are entitled to vote to accept or reject the Plan.

**B.** **Executory Contracts and Unexpired Leases**

    **1.** **Assumed Contracts and Leases.** The following executory contracts and/or unexpired leases shall be deemed **ASSUMED** on the Effective Date:

      a.   Hellar Financial
      b.   Fleet Business Credit
      c.   Williamson Eye Center
      d.   Canon Financial Services
      e.   Ramon Aizpurua, M.D.
      f.   David Planche, M.D.
      g.   Renee Harris, M.D.
      h.   Gary Barrow, M.D.
      i.   Harry A. Burglass, Jr., M.D.
      j.   Agilent Financial Services, Inc.—previously assumed
      k.   CVT Vascular Lab, Inc.
      l.   Fetametrics
      m.   Swee Shubkin
      n.   Alex Suarez
      o.   Chance Victoriano
      p.   Charles Hollier
      q.   HCFA
      r.   Susan Puyau, M.D.

    It is debatable whether or not the Debtor's contracts with individual physicians constitute executory contracts which may be assumed. The Debtor simply wishes to confirm that these contracts are assumed to the extent that they may be so assumed and that the Debtor desires to continue its professional relationship with said physicians.

    **2.** **Rejected Contracts and Leases.** All executory contracts and/or unexpired leases not listed above and which have not been assumed by the Debtor prior to the Confirmation Date shall be deemed **REJECTED** on the Effective Date.

    **3.** **Undetermined Contract.** Debtor is analyzing the executory contract with Gulf South Health Plans and will determine whether to accept or reject at the Confirmation Hearing.

    **4.** **Default/Arrearage.** Unless otherwise indicated herein, agreed upon in writing, by the Debtor, or required by Final Order of the Court, any such monetary default or other arrearage due on an assumed contract or lease shall be paid in full, without interest, on a pro-rata basis with Class 4 Claims after resolution of the disputed claim. Confirmation of this Plan shall be deemed equivalent to a finding by the Court that the foregoing provisions for curing arrearages and monetary defaults are reasonable and that no additional adequate assurance of future performance need be furnished by the Debtor. Any and all such claims shall be filed within twenty (20) days of the Confirmation Date, and unless specifically

admitted by the Debtor, shall be treated as disputed, and any such claims not filed within the required time period shall be forever discharged.

## C. Miscellaneous Provisions

1.  **Retention of Jurisdiction.** As more specifically provided in the Plan, the Court shall retain jurisdiction with respect to all matters arising out of and related to the Chapter 11 bankruptcy case and Plan of Reorganization, after the Confirmation Date.

2.  **Post Confirmation Fees and Expenses.** All professional fee requests must be filed with the Court within thirty (30) days after the Confirmation Date, however, on or before the Confirmation Date, all such applicants must provide the Debtor with an estimate of the aggregate amount of fees and expenses to be incurred through the Effective Date. Administrative Expenses Claims must be filed within thirty (30) days after the Confirmation Date, or such claims shall be forever barred, except as otherwise may be ordered by the Court.

3.  **Amendment and/or Modification of the Plan.** The Plan may be amended or modified at any time prior to the Confirmation Date upon such notice as the Court may require. The Plan may be amended or modified at any time prior to the Effective Date, with the approval of the Court, to remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as it does not materially and adversely affect holders of Claims or Interests. The invalidity, voidness, or unenforceability of any provision of the Plan will in no way limit or affect the enforceability and operative effect of any other provisions of the Plan.

4.  **Discharge.** The rights and treatment afforded in the Plan for all claims against and interests in the Debtor will be in exchange for and in complete satisfaction, discharge, and release of claims and interests of any nature, including any interest accrued on such claims from and after the Petition Date, against the Debtor and any of its assets. Except as otherwise provided in the Plan, on the Effective Date, claims against and interests in the Debtor will be satisfied, discharged, and released, in full, and all persons shall be precluded from asserting against the Debtor, its successors, or their respective assets or further claims against or interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

5.  **Binding Effect.** The Plan will be binding upon and inure to the benefit of the Debtor and the holders of claims against and interests in the Debtor.

## D. Means of Execution and Implementation of the Plan

The Plan defines two (2) significant dates: the Confirmation Date and the Effective Date. The Confirmation Date is the date upon which the Confirmation Order is entered by the Court. The Effective Date is the date upon which the Confirmation Order is effective and is defined as ten (10) days after receipt of a written agreement (the "Trusteeship Agreement"): (1) terminating

the Pension Plan under 29 U.S.C. §§1341 or 1342; (2) appointing PBGC statutory trustee of the Pension Plan; and (3) establishing a date of plan termination under 29 U.S.C. §1348, and signed by both the authorized representatives of the Plan Administrator of the Pension Plan and PBGC. Upon receipt of the Trusteeship Agreement, Debtor shall immediately file written notice of such receipt with the Court and notify counsel for the Unsecured Creditors Committee, PBGC, and the Office of the U.S. Trustee. The delay in the Effective Date is necessitated by the process of terminating the Pension Plan under ERISA. Debtor estimates that said determination will occur approximately ninety (90) days after the Confirmation Date.

1. **Distributions.** The proposed distributions to be made under the Plan may differ from the actual distributions, which are made for many reasons, including substantial variations in the amounts of allowed claims or the ultimate allowance of any disputed claims.

2. **Corporate Existence.** On and after the Confirmation Date, the Debtor shall continue in existence as Stanocola Employees Medical and Hospital Association, Inc., and shall remain in possession and management of its property.

3. **Objections.** Unless another date is established by the Court, any objections to the allowance or classification of any claim or interest, shall be filed within ten (10) business days following the Confirmation Date or be forever barred from filing such an objection.

4. **Default.** Any payment required to be made under the Plan shall not be in default if any such payment is made within thirty (30) days of the payment date provided under the Plan.

5. **Management Compensation.** The Debtor will continue to be operated by its current management, Lee Chastant, III/Chief Executive Officer and Wanda M. Allphin/Chief Financial Officer, after confirmation of this Plan. Current management monthly salaries are: $6,354 and $3,833, respectively.

## VI. TAX CONSEQUENCES OF PLAN

FOR THESE REASONS, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE PLAN TO THEM UNDER APPLICABLE FEDERAL, STATE AND LOCAL TAX LAWS.

### A. Tax Consequences to Holders of Claims

Holders of claims may be required to recognize income or may be entitled to a deduction as a result of implementation of the Plan. The exact tax treatment depends on, among other things, each holder's method of accounting, the nature of each holder's claim, the fair market value of any property received, and whether and to what extent such holder has taken a bad debt deduction in prior taxable years with respect to the particular debt owed to it by the Debtor. A holder's method of accounting and the extent such holder has taken a bad debt deduction determines a holder's "tax basis" in its claim. To the extent that the fair market value of property received under the Plan exceeds the "tax basis" in the claim, taxable income must be recognized by a holder. To the extent the "tax basis" in a holder's claim is greater than the fair market value of property received under the Plan, a loss may be recognizable. ALL HOLDERS OF CLAIMS

SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF IMPLEMENTATION OF THE PLAN TO THEM UNDER APPLICABLE FEDERAL, STATE AND LOCAL TAX LAWS.

**B.     Tax Consequences to the Debtor**

Except as explained above in Section III, B herein, the Debtor does not anticipate that the Plan will result in any tax consequences to the Debtor.

## VII.  CONFIRMATION STANDARDS

The Court shall confirm the Plan at the Confirmation Hearing only if the requirements of §1129 of the Code are met.   Among the requirements for confirmation of a plan of reorganization are that the Plan must be (1) accepted by all impaired classes of claims and equity interest, or if rejected by an impaired class, that the Plan does not discriminate unfairly and is fair and equitable as to such class, (2) feasible, and (3) in the best interest of holders of claims and interest that are impaired under the Plan.

**A.     Acceptance**

Each impaired class must accept the Plan by the percentages set forth in §1126 of the Code. Under the Plan, Classes 1 through 5 are impaired by the Plan and are entitled to vote to accept or reject the Plan.   In addition, the Debtor expressly reserves the right to seek confirmation under §1129(b) of the Code, as long as one (1) impaired class has affirmatively voted to accept the Plan, not counting the votes of any "insiders".   In order to be confirmed pursuant to §1129(b) of the Code, the Court must find, with respect to each unaccepting class, that the Plan "does not discriminate unfairly" and is "fair and equitable with respect to that class".   A plan does not discriminate unfairly if no class receives more that it is entitled to for its claim.   The Code establishes different "fair and equitable" tests for secured creditors and unsecured creditors as follows:

1.     **Secured Creditors.**  A secured creditor whose claims are impaired must retain the liens securing its claim and receive under the Plan, cash payments that have a present value at least equal to such holder's allowed secured claim, or otherwise receive the "indubitable equivalent" of the value of the interest in the Debtor's asset upon which it holds a lien.

2.     **Unsecured Creditors.**  An unsecured creditor whose claim is impaired must receive or retain under the Plan, property of a value at least equal to the amount of its allowed unsecured claim, or the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

**B.     Feasibility**

If the Debtor is proposed to be reorganized, the Court must also determine that confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Debtor.   For the purposes of determining whether the Plan meets this requirement, the Debtor has prepared a projection of its financial performance for the initial plan period.   Those projections are attached hereto as Exhibits D through F.

## C.    Best Interests

Section 1129(a)(7) of the Code requires that, with respect to each impaired class, each member of such class either has accepted the Plan, or will receive or retain under the Plan on account of its claim, property of a value, as of the Effective Date, that is at least equal to the amount which such member of the class would receive or retain if the Debtor were liquidated under Chapter 7 of the Code. The Court, in considering whether the Plan is in the "best interests" of creditors, is not required to consider any alternative to the Plan other than the dividend projected in a liquidation of all the Debtor's assets under Chapter 7 of the Code. The Debtor has determined that confirmation of the Plan will provide each holder of an allowed claim or interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under Chapter 7 of the Code.

## D.    Good Faith Requirement

In order to confirm a Plan, the Court must find that the Plan was proposed in good faith and that the Plan and its proponent have compiled with all applicable provisions of the Code.

## VIII. ALTERNATIVES TO THE PLAN

### A.    Dismissal of the Case

If a Plan cannot be confirmed in this case, an alternative would be the dismissal of the Debtor's case. Absent bankruptcy administration, the Debtor's assets would be liquidated in a manner that could result in the preferential treatment of certain creditors rather than the equal treatment of similarly situated creditors.

### B.    Conversion of the Case to Chapter 7 of the Code

If no Chapter 11 Plan of Reorganization can be confirmed, the bankruptcy case may be converted to a liquidation case under Chapter 7 of the Code, and a trustee would be elected or appointed to liquidate the assets of the Debtor. The Debtor believes that liquidation under Chapter 7 would result in significantly reduced distributions to holders of allowed unsecured claims and interests.

## IX. CONCLUSION AND RECOMMENDATION

This Disclosure Statement is intended to assist each holder of claims against, and interests in, the Debtor to make an informed decision regarding the acceptance of Debtor's Plan. If the Plan is accepted, all creditors will be bound by its terms. The Debtor believes that confirmation and implementation of this Plan is preferable to any of the alternatives described above because it will provide a greater recovery to claimants than any other alternative. Therefore, the Debtor respectfully urges each holder of a claim against or interest in the Debtor to carefully review the Disclosure Statement and the enclosed copy of the Plan, to accept the Plan and to evidence such acceptance by returning their ballots on or before the date to be fixed by the Court.

DATED: April 10, 2002
By Attorney for Stanocola Employees Medical and Hospital Association, Inc.

**STEFFES, VINGIELLO & MCKENZIE, LLC**
Attorneys-At-Law
3029 S. Sherwood Forest Blvd.
Suite 100
Baton Rouge, LA 70816
Telephone: (225) 368-1006
Fax: (225) 368-0696

_/s/ Arthur A. Vingiello_
Arthur A. Vingiello (#13098)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

**In re:**
**STANOCOLA EMPLOYEES MEDICAL AND HOSPITAL ASSOCIATION, INC.**
**Debtor**

**CASE NO. 01-11734**
**CHAPTER 11**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## STANOCOLA EMPLOYEES MEDICAL AND HOSPITAL ASSOCIATION, INC.
## SECOND AMENDED PLAN OF REORGANIZATION
## DATED APRIL 10, 2002

Stanocola Employees Medical and Hospital Association, Inc., Debtor and Debtor-in-Possession herein ("Debtor"), hereby proposes the following Plan of Reorganization, pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code.

## ARTICLE I
## DEFINITIONS

For purposes of this Chapter 11 Plan of Reorganization and any subsequent amendments or modifications hereof, the following terms shall have the following meanings, and any term used herein, which is defined in the Code, but not defined herein, shall have the meaning set forth in the Code:

1.01 **"Administrative Expense Claim"** shall mean any Allowed Claim which is a cost or expense of administration incurred by the Debtor on or before the Effective Date in connection with the Bankruptcy Case which has priority pursuant to §§503(b), 330, or 507(a)(1) of the code, including, without limitation, the actual and necessary costs and expenses of operating the Debtor's business, all allowances for compensation or reimbursement of fees and expenses to the extent allowed by the Code upon Final Order of the Court and any quarterly fees owing to the Office of the United States Trustee through the date of confirmation.

1.02 **"Allowed Claim"** shall mean a claim (1) in respect of which a proof of claim has been filed with the Court within the applicable period of limitation fixed by Rule 3003 of the Federal Rules of Bankruptcy Procedure, or filed thereafter with the Court pursuant to a Final Order, or (2) contained in the Schedule of Assets and Liabilities or State of Financial Affairs of the Debtor of the confirmation date, and not listed as disputed, contingent, or unliquidated as to amount, and in either case as to which no written

objection to the allowance thereof has been filed within any applicable period of limitation fixed by Rule 3007 of the Federal Rules of Bankruptcy Procedure, or an order of the Court, or as to which any such objection has been determined by an order of judgment which is no longer subject to appeal and as to which no appeal is pending. An allowed claim shall not include unmatured or post-petition interest on the principal amount of such claim, except as specifically provided herein.

1.03 **"Allowed Interest"** shall mean an interest in the Debtor to the extent that such interest is listed in the Schedule of Assets and Liabilities or Statement of Financial Affairs of the Debtor on the date of confirmation; provided, however that a timely filed proof of interest shall supersede any such listing and, in either case, an interest as to which no written objection to the allowance thereof has been filed within the period of time fixed by the Code or by Final Order of the Court; or as to which any such objection has been determined by order or judgment which is no longer subject to appeal and as to which no appeal is pending.

1.04 **"Bankruptcy Case"** shall mean that case entitled Stanocola Employees Medical and Hospital Association, Inc., currently pending in the Middle District of Louisiana, United States Bankruptcy Court, bearing Case No. 01-11734.

1.05 **"Business Day"** shall mean any day other than Saturday, Sunday, or a legal holiday (as such term is defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

1.06 **"Cash"** shall mean cash, cash equivalents, and other readily marketable securities or instruments including, without limitation, proceeds, direct obligations of the United Sates of America or the agencies or instrumentalities thereof, certificates of deposits issued by banks, and commercial paper of any entity.

1.07 **"Cause of Action"** shall mean any account, contract right, general intangibles and any other right, claim, or cause of action of any kind, whether legal or equitable, of the Debtor for affirmative recovery of Cash or other property of the estate (whether such cause is the subject of a presently pending lawsuit, adversary proceeding, appeal, or otherwise) which has accrued prior to the Confirmation Date or may thereafter accrue, whether from matters that occurred prior to or after the Confirmation Date, including without limitation, any right or claim under §510 or §§544 through 550 of the Code, and any state law right or claim belonging to the Debtor.

1.08 **"Claim"** shall have the meaning set forth in §101(4) of the Code, and include any right to payment, or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, in existence on or as of the Petition Date, against the Debtor, whether or not such right to payment or right to equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured.

1.09 **"Claimant"** shall mean any holder of a Claim against the Debtor that arose on or before the Petition Date, or a Claim against the Debtor's estate of a kind specified in §§502(g), 502(h), or 502(1) of the Code.

1.10 **"Class"** shall mean a category of holder of Claims or Interests, which are substantially similar to the other Claims of Interests in such category.

1.11 **"Code"** shall mean Title 11 of the United States Code, 11 U.S.C. §101, et seq., any amendments thereto.

1.12 **"Confirmation Date"** shall mean the date upon which the Confirmation Order is entered by the Court.

1.13 **"Confirmation Order"** shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code, whether such order shall have become a Final Order or not.

1.14 **"Court"** shall mean the United States Bankruptcy Court for the Middle District of Louisiana in which the Debtor's Bankruptcy Case is pending and any court having competent jurisdiction to review order of, or to hear appeals from the Bankruptcy Court.

1.15 **"Debtor"** shall mean Stanocola Employees Medical and Hospital Association, Inc., a Louisiana 501 (c)(3) Not-For-Profit organization.

1.16 **"Debtor's Assets"** shall mean all property of the Debtor's estate as defined by §541(a) of the Code, including, without limitation, all rights, claims, and interests of the Debtor in any real or personal property, together with all tangible or intangible property of any kind or nature, including all insurance policies and any proceeds thereof.

1.17 **"Deficiency Claim"** shall mean an Allowed Claim against the Debtor equal to the amount by which the aggregate claim exceeds the sum of any setoff rights of the holder against the Debtor, plus the net proceeds realized from the disposition of the collateral securing such claim or, if such collateral is not liquidated to cash, the value of the interest of the holder in the Debtor's interest in the collateral securing the claim; provided, however, that if the holder of such claim makes the election provided in §1111(b) of the Code, there shall be no deficiency claim with respect to such election.

1.18 **"Disputed Claim"** shall mean a claim as to which written objection to the allowance or classification thereof, in whole or in part, has been timely filed by any part in interest, and as to which no Final Order or judgment sustaining such objection or allowing or disallowing such claim, in whole or in part, has been entered by the Court.

1.19 **Effective Date"** shall mean the date upon which the Confirmation Order is effective and is defined as ten (10) days after receipt of a written agreement (the "Trusteeship Agreement"): (1) terminating the Pension Plan under 29 U.S.C. §§1341 or 1342; (2) appointing PBGC statutory trustee of the Pension Plan; and (3) establishing a date of plan

termination under 29 U.S.C. §1348, and signed by both the authorized representatives of the Plan Administrator of the Pension Plan and PBGC. Upon receipt of the Trusteeship Agreement, Debtor shall immediately file written notice of such receipt with the Court and notify counsel for the Unsecured Creditors Committee, PBGC, and the Office of the U.S. Trustee. The delay in the Effective Date is necessitated by the process of terminating the Pension Plan under ERISA. Debtor estimates that said determination will occur approximately ninety (90) days after the Confirmation Date.

1.20 **"Final Order"** shall mean an order of judgment of the Bankruptcy Court or other court of competent jurisdiction which may hear appeals from the Bankruptcy Court which having not been reversed, modified or amended, and not being stayed, and the time to appeal from which or to seek review or rehearing or petition for certiorari from which having expired without a stay being granted and an appeal or application for review of rehearing having been filed, has become final and is in full force and effect.

1.21 **"Interest"**, except which otherwise inconsistent with the context of its use herein, shall mean the legal, equitable, and contractual rights resulting from being an owner or any equity interest in the Debtor.

1.22 **"Person"** shall mean any individual, corporation, partnership, joint venture, trust, estate, unincorporated organization or governmental unit, or any agency or political subdivision of a governmental unit.

1.23 **"Petition Date"** shall mean July 20, 2001, the date upon which the Debtor filed its voluntary Chapter 11 Petition for Relief with the Court.

1.24 **"Plan"** shall mean this Plan of Reorganization, all addenda, exhibits, schedules, releases, and other attachments, and any amendments, modifications, or alterations thereof.

1.25 **"Priority Claim"** shall mean an Allowed Claim entitled to priority under §§507(a)(2), 507(a)(3), 507(a)4, 507(a)5, 507(a)6, 507(a)7, and 507(a)9 of the Code.

1.26 **"Priority Tax Claim"** shall mean an Allowed Claim entitled to priority under §507(a)8 of the Code.

1.27 **"Pro rata"** shall mean in the same proportion that the amount of a claim or interest in a particular class bears to the aggregate amount of all claims or interests in such class, including in such aggregate amount both Allowed Claims and any unresolved Disputed Claims in such Class as of the date of any distribution payment pursuant to the Plan.

1.28 **"Secured Claim"** shall mean an Allowed Claim which is secured by lien, security interest, or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under §553 of the Code to the extent of the value of such secured claim as determined in accordance with §506(a) of the Code.

1.29   **"Stanocola"** shall mean Stanocola Employees Medical and Hospital Association, Inc., a Louisiana 501 (c)(3) organization, and Debtor and Debtor-in-Possession herein.

1.30   **"Subordinated Claim"** shall mean an Allowed Claim which is subordinated to the payment of Unsecured Claims either by contract or pursuant to §510 of the Code.

1.31   **"Taxing Authority"** unless otherwise specified, shall mean the Internal Revenue Service, the Louisiana Department of Revenue and Taxation, and any local taxing authorities.

1.32   **"Unsecured Claim"** shall mean an Allowed Claim which arises under any executory contract or unexpired lease which has been rejected, any Deficiency Claim, any claim or a general trade creditor, or any claim for unpaid wages or benefits (including claims for vacation, sick and holiday pay) to the extent no entitled to priority and any other obligation, liability or claim of any kind or nature held against the Debtor, which was incurred on or before the Petition Date; provided, however, that an Unsecured Claim, shall not include any Secured Claim, Administrative Expense Claim, Priority Claim, or Subordinated Claim.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

The Debtor hereby designates the following Classes:

2.01   **Class 1 Secured Claim (Union Planters Bank).**  Class 1 shall consist of the Allowed Secured Claim of Union Planters Bank, which has a valid security interest in and upon certain equipment and accounts receivable of the Debtor.  Class 1 is impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

2.02   **Class 2 Secured Claim (Union Planters Bank).**  Class 2 shall consist of the Allowed Secured Claim of Union Planters Bank, which has a valid security interest in and upon certain equipment and accounts receivable.  Class 2 is impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

2.03   **Class 3 Secured Claim (Bayou Federal Credit Union).**  Class 3 shall consist of the Allowed Secured Claim of Bayou Federal Credit Union, which has a valid security interest in an upon a certain vehicle, namely a 2000 Chevrolet Astro Van, vehicle identification number 1GNDM19W8YB136841.  Class 3 is not impaired under the Plan, and the holder of such claim is entitled to vote to accept or reject the Plan.

2.04   **Class 4 Unsecured Claims (Convenience Class).**  Class 4 shall consist of all Allowed Unsecured Claims in the amount of $500.00, or less, and the Allowed Unsecured Claims of holders of Allowed Unsecured Claims that elect, in writing, to reduce their claims to

$500.00 or less. Class 4 <u>is impaired</u> under the Plan, and the holders of such claims are entitled to vote to accept or reject the Plan.

2.05    **Class 5 Unsecured Claims (Claims Greater Than $500.00).** Class 5 shall consist of all Allowed Unsecured Claims of more than $500.00, exclusive of those holders who elect to be treated as Class 4 Claims. Class 5 <u>is impaired</u> under the Plan, and the holders of such claims are entitled to vote to accept or reject the Plan.


# ARTICLE III
# TREATMENT OF CLAIMS AND INTERESTS


3.01    **Administrative Expense Claims.** Administrative Expense Claims shall not be classified. This amount shall include the claims of all professionals for services rendered in these bankruptcy proceedings, and any claim of the Office of the United States Trustee for regular quarterly fees under Section 9.09 herein. Allowed administrative expense claims shall be paid, in full, within thirty (30) days of the Confirmation Date, out of current cash flows and, to the extent necessary, with assets from the 457 Plan, or upon such other terms as may be agreed upon in writing between the holder of such claim and the Debtor; provided, however, any allowed administrative expense which is incurred in the ordinary course of business shall be paid when due in the ordinary course of business. Any administrative expense claim allowed by the Court after the Effective Date shall be paid, in full, within thirty (30) days of the issuance of a Final Order of the Court allowing such claim, unless the holder of such claim consents, in writing, to a different treatment of its claim.

3.02    **Priority Tax Claims.** Allowed Priority Tax Claims shall not be classified. Allowed priority tax claims shall be paid in full, in sixty (60) equal monthly installments, beginning within thirty (30) days of the Effective Date, with interest at the appropriate statutory rate, unless the holder of such claim consents, in writing, to a different treatment of its claim.

3.03    **Priority Claims.** Allowed Priority Claims shall not be classified. Allowed priority claims shall be paid, in full, within thirty (30) days of the Effective Date, or upon such other terms as may be agreed upon in writing between the holder of such claim and the Debtor. Any claims allowed by the Court after the Confirmation Date shall be paid in full within thirty (30) days of the issuance of a Final Order of the Court allowing such claim, unless the holder of such claim consents, in writing, to a different treatment of its claim.

3.04    **Class 1 Secured Claim (Union Planters Bank).** The Class 1 claim is estimated to be approximately $315,000.00 as of June, 2002, and shall be paid, with interest to accrue at the contractual rate, in monthly installments of $13,500.00 beginning on the fifteenth (15th) date of the first, full month after the Confirmation Date, and continue thereafter on the fifteenth (15th) day of each subsequent month until such claim is paid in full. The

security interest of Union Planters Bank shall survive confirmation until such claim is paid, in full, as provided under §506 of the Code.

3.05 **Class 2 Secured Claim (Union Planters Bank).** The Class 2 claims are estimated to be approximately $496,000.00 as of June, 2002, and shall be paid, with interest to accrue at the contractual rate, in monthly installments of $4,500.00 beginning on the fifteenth (15th) day of the first full month after the Confirmation Date, and continue thereafter on the fifteenth (15th) day of each subsequent month until Class 1 Secured Claim to Union Planters is paid in full. Then Class 2 payment will increase to $17,500.00 beginning on the fifteenth (15th) day of the first month after full payment of Class 1 until Class 2 claim is paid in full. The security interest of Union Planters Bank shall survive confirmation until such claim is paid, in full, as provided under §506 of the Code.

3.06 **Class Secured Claim (Bayou Federal Credit Union).** This Class 3 claim is estimated to be approximately $17,375.00, as of February, 2002 and shall continue be paid, with interest to accrue at the contractual rate, in monthly installments of $422.22, on the fifteenth (15th) day of each month according to the terms of the original contract, and continue thereafter on the fifteenth (15th) day of each subsequent month until such claim is paid in full or contract option is exercised. The security interest of Bayou Federal Credit Union shall survive confirmation until such claim is paid in full, or contract option is exercised, as provided under §506 of the Code.

3.07 **Class 4 Unsecured Claims (Convenience Class).** Class 4 Claims shall be paid in full, without interest, on the Effective Date with funds provided by the 457 Plan.

3.08 **Class 5 Unsecured Claims (Claims Greater Than $500.00).** Class 5 Claims shall be paid a lump sum of approximately $250,000 from the remaining 457 Plan assets 30 days after the Effective Date on a pro-rata basis. In addition, $100,000 annually will be paid in quarterly payments beginning with the first quarter in the year of 2003, to be paid on March 31, 2003 and continuing for a total of forty (40) quarters. In addition, the Debtor agrees that is there are to be any monies forthcoming from Gulf South, above and beyond the obligations in its executory contract, the Class 5 Debtor would get additional monies on a pro-rata basis in the next scheduled quarterly payment after such monies are received.

### ARTICLE IV
### ACCEPTANCE OR REJECTION OF THE PLAN

4.01 **Voting Classes.** Each holder of an Allowed claim in Classes 1 through 5 shall be entitled to vote to accept or reject the Plan, unless otherwise ordered by the Court.

4.02 **Confirmability of the Plan.** The confirmation requirements of §1129 of the Code must be satisfied with respect to the Debtor and the Plan. If the Court determines that any provisions of the Plan are prohibited by the Code, or render the Plan unconfirmable under

§1129 of the Code, the Debtor reserves the right to sever such provision from the Plan, and to request that the Plan, as so modified, be confirmed.

4.03   **Nonconsensual Confirmation.**   In the event that any class fails to accept the Plan, the Debtor hereby requests that the Court confirm the Plan over such rejection in accordance with §1129 of the Code.

4.04   **Controversy Concerning Impairment.**   In the event of a controversy as to whether any class or interest is impaired by the Plan, the Court, after notice and an opportunity for hearing, shall determine such controversy.


# ARTICLE V
## MEANS OF EXECUTION AN IMPLEMENTATION


5.01   **Corporate Existence.**   On and after the Confirmation Date, the Debtor shall continue in existence as Stanocola Employees Medical and Hospital Association, Inc., and shall remain in possession and management of its property.

5.02   **Employee Benefits.**   The reorganized Debtor shall continue to make payment of all benefits for the duration of the period that the Debtor has obligated itself to provide such benefits.

5.03   **Disbursing Agent.**   The Debtor shall act as disbursing agent under the Plan.

5.04   **Abandonment of Avoidance Actions.**   On the Effective Date, except as otherwise provided herein, all avoidance actions pursuant to §§544,545,547, 548, 549, 550 and 553 of the Code, shall be considered dismissed with prejudice and shall not be pursued by the Debtor.

5.05   **Vesting of Assets and Discharge.**   On and after the Effective Date, the Debtor shall continue to operate its business, and may use, acquire, and dispose of its property without supervision or approval by the Court, and free of any restriction of the Code other than as expressly provided herein. The Debtor's assets shall vest in the reorganized Stanocola Employees Medical and Hospital Association, Inc., free and clear of claims, liens, charges, encumbrances, and interests, except as otherwise provided herein. On and after the Effective Date, the Debtor shall no longer be liable for and shall be discharged from any and all claims against the Debtor except as otherwise provided herein. The Confirmation Order shall be a judicial determination of the discharge of liabilities of and claims against the Debtor and Debtor-in-Possession except as may be otherwise provided herein. In addition, confirmation of the Plan shall operate as of the Effective Date to enjoin any action against a guarantor or co-obligor of any claim settled or satisfied under the terms of the Plan during the term of the Plan.

5.06 **Waiver of Subordination.** The distributions made to the various classes of creditors and on account of administrative expense and priority claims take into account the relative priorities of the claims in each class in connection with any contractual subordination provisions relating thereto, therefore, no distribution hereunder shall be subject to levy, garnishment, attachment or like legal process by a creditor or administrative expense claimant or holder of any interest or a senior class of creditors by reason of claimed contractual subordination rights, and each creditor, and administrative expense claimant will receive the benefit of the distributions set forth in this Plan.

5.07 **Objections to Claims.** Unless another date is established by the Court, all objections to claims that are fixed prior to the Effective Date shall be filed and served on the holders of such claims or interests within ten (10) business days following the Confirmation Date or be forever barred from filing such an objection.

5.08 **Payments on Disputed Claims.** Prior to the first quarterly payment to holders of Class 5 claims, any disputed claims shall be estimated into two (2) claims, one portion disputed and the other portion allowed. The allowed portion shall be paid with and in the same manner as all other allowed claims within such class. Disputed claims and any disputed portion of a claim shall be paid in the next quarterly distribution following the date upon which such dispute is finally resolved in an amount sufficient to bring the newly allowed claim up to the percentage received by all other holders of Class 5 claims.

5.09 **Default.** Any payment required to be made under the Plan shall not be in default if such payment is made within thirty (30) days of the payment date provided under the Plan.

5.10 **Interference with Consummation.** No entity may commence or continue any action or proceeding, or perform any act to interfere with the implementation or consummation of the Plan and the payments to be made hereunder.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01 **Acceptance of Executory Contracts and Unexpired Leases.** The following executory contracts and/or unexpired leases shall be deeded **ASSUMED** on the Effective date:

1. Hellar Financial
2. Fleet Business Credit
3. Williamson Eye Center
4. Canon Financial Services
5. Ramon Aizpurua, M.D.
6. David Planche, M.D.
7. Renee Harris, M.D.
8. Gary Barrow, M.D.
9. Harry A. Burglass, Jr., M.D.

10. Agilent Financial Services, Inc.—previously assumed
11. CVT Vascular Lab, Inc.
12. Fetametrics
13. Swee Shubkin
14. Alex Suarez
15. Chance Victoriano
16. Charles Hollier
17. HCFA
18. Susan Puyau, M.D.

6.02 **Rejection of Executory Contracts and Unexpired Leases.** All executory contracts and/or unexpired leases not listed above and which have not been assumed by the Debtor prior to the Confirmation Date shall be deemed **REJECTED** on the Effective Date.

6.03 **Claims Based on Executory Contracts and Unexpired Leases.** Unless otherwise indicated herein, agreed upon in writing by the Debtor, or required by Final Order of the Court, any such monetary default or other arrearage due on an assumed contract or lease shall be paid in full, without interest, on a pro-rata basis upon the first scheduled quarterly installment payment to holder of Class 4 claims, after resolution of the disputed claims. Confirmation of this Plan shall be deemed equivalent to a finding by the Court that the foregoing provisions for curing arrearages and monetary defaults are reasonable and that no additional adequate assurance of future performance need be furnished by the Debtor. Any and all such claims shall be filed within twenty (20) days of the Confirmation Date, and unless specifically admitted by Debtor, shall be treated as disputed, and any such claims not filed within the required time period shall be forever discharged.

6.03 **Assignment.** The Debtor retains the right to assign executory contracts and unexpired leases as provided under §365 of the Code.

## ARTICLE VII
## RETENTION OF JURISDICTION

7.01 The Court shall retain and have exclusive jurisdiction over the Bankruptcy Case on and after the Confirmation for the following purposes:

1. To hear and determine any and all objections to claims or proof of claims whenever filed both before and after the Confirmation Date, including any objections to the classification of any claim and to allow or disallow and disputed claim, in whole or in part;

2. To hear and determine any and all motions to estimate claims regardless of whether the claim is the subject of a pending objection, a pending appeal, or otherwise.

3. To hear and determine all pending applications for the assumption or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine the allowance of any claims resulting from rejection thereof;

4. To enforce the provisions of the Plan and to enforce any proposed modifications or amendments thereto;

5. To hear and determine any and all applications, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or commenced thereafter;

6. To consider any modifications of the Plan, to cure any defect or omission, or reconcile and inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

7. To hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, implementation, or enforcement of the Plan, the Debtor's obligations under the Plan, releases, or any Claim asserted against the estate;

8. To enter such orders in aid of execution of the Plan to the extent authorized by §1142 of the Code, including such order aiding or promoting the transfer of the economic or ownership interests of the Debtor, but not to the extent that such orders are in regard to matters within the sole jurisdiction of police or regulatory authorities;

9. To hear and determine such other matters as may be set forth in the Confirmation Order, or as may arise in connection with the Plan or the Confirmation Order, or their implementation;

10. To enforce all order, judgment, injunctions, and rulings entered in connection with the Bankruptcy Case;

11. To hear and determine any and all applications for allowance of compensation and reimbursements of expenses and other fees and expenses authorized to be paid or reimbursed under the Code or provided for in the Plan;

12. To hear and determine all proceedings to recover all assets of the Debtor and property of the estate, wherever located, including any causes of action under §§544 through 553, and 553(b) of the Code, and any other causes of action or rights to payment of claims, that belong to the Debtor, that may be pending on the Confirmation Date or that may be instituted at any time thereafter;

13. To hear and determine matters concerning state, local, and federal taxes in accordance with §§346, 505 and 1146 of the Code;

14. To grant extensions of any deadlines set herein;

15. To enforce all discharge provisions under the Plan;

16. To hear and determine any other matter as to which jurisdiction is not inconsistent with the Code, and

17. To enter a final order concluding and terminating the Bankruptcy Case.

7.02 **Abstention.** If the Court abstains or declines from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Case, this Article shall have no effect upon and shall not control, prohibit, or limit the exercise or jurisdiction by any other Court having competent jurisdiction with respect to such matter.

## ARTICLE VIII
## EFFECT OF CONFIRMATION

8.01 **Binding Effect.** Except as otherwise expressly provided herein, on and after the Effective Date, the terms of the Plan shall bind all holders of claims and interests, whether or not they accept the Plan.

8.02 **Discharge.** Except as otherwise expressly provided in §1141 of the Code or the Plan, the distributions made pursuant to the Plan will be in full and final satisfaction, settlement, release, and discharge as against the Debtor or any of its assets or properties, of any debt that arose before the Confirmation Date and any debt of a kind specified in §§502(g), 502(h), or 502(I) of the Code an all claims and interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (1)a proof of claim or interest based on such debt, obligation, or interests filed or deemed filed under §501 of the Code, (2) such claim or interest is an allowed claim or interest under §502 of the Code, or (3) the holder of such claim or interest has accepted the Plan.

8.03 **Post-Confirmation Injunction.** Except as set forth herein, on and after the Confirmation Date, every holder of a claim or interest against the Debtor shall be precluded and permanently enjoined from asserting against the Debtor, its members, officers, directors, professionals, and agents, or their respective assets or properties, any further claim based on any document, instrument, judgment, award, order, act, omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date.

**8.04    Post-Confirmation Evidence of Claims and Interests.**  Except as otherwise provided herein, upon the Effective Date, all notes, certificates, and evidence of claims or interests shall represent the only right to participate in distribution under the Plan.

**8.05    Continuation of Injunctions and Stays.**  Except as otherwise provided herein, all injunctions, liens, or stays ordered in the Bankruptcy Case pursuant to §105 or 362 of the Code or otherwise in existence on the Petition Date, and existent immediately prior to the Confirmation Date shall remain in full force and effect.

**8.06    Release and Exculpation.**  Except for the obligations created by the Plan, for good and valuable consideration, including without limitation, the benefits of the Plan, the promises and obligations of the Debtor and the efforts and contributions of the officers and directors of the Debtor in bringing about the confirmation and consummations of the Plan, and to permit the effective and expeditious reorganization of the Debtor, on the Effective Date, the Debtor shall be deemed to have unconditionally waived and released any and all rights, claims, liabilities, and causes of actions.

**ARTICLE IX**
**MISCELLANEOUS PROVISIONS**

**9.01    Payment Dates.**  Whenever any payment to be made or action to be taken under the Plan is due to be made or taken on a day other than a business day, such payment will instead be made, without accruing interest for such delay, or action will instead be taken on the next business day.

**9.02    Bar Date:  Administrative Expense Claims.**  Subject to further order of the Court, all applications for the payment of administrative expenses, other than those constituting fee requests pursuant to §503(b) of the Code, shall be filed with the Court within thirty (30) days of the Confirmation Date.  Any requests for payment of such administrative expenses not so scheduled by the Debtor or filed within such time period shall be discharged and forever barred except as otherwise may be ordered by the Court.

**9.03    Bar Date:  Fee Requests.**  All fee requests must be filed with the Court within thirty (30) days after the Confirmation Date.  Objections to such fee requests may be filed by any party in interest within the later of sixty (60) days after the Confirmation Date or thirty (30) days after such fee request is filed with the Court.  On or prior to the Confirmation Date, each person that has sought or will seek to file a fee request shall deliver to the Debtor an estimate of the aggregate fees and expenses through the Effective Date which shall be requested by such person, (including, if applicable, any amount previously requested and subject to holdback).  Any such estimate shall be binding on such person, and such person shall not apply for fees and expenses accruing during the bankruptcy case in excess of such estimate; provided, however, that such estimate shall not be binding unless the Confirmation Order is entered within ten (10) business days of the scheduled Confirmation Hearing.

9.04 **Governing Law.** Unless otherwise agreed in writing, or mandated by federal law, the law of the State of Louisiana shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

9.05 **Monthly Financial Reports.** The Debtor shall no longer be required to file monthly financial reports after the Confirmation Date.

9.06 **Binding Effect.** The rights, duties, and obligations of any person or entity names or referred to in the Plan shall be binding upon and shall inure to the benefit of such person or entity and their respective successors and assigns.

9.07 **Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor will file with the Court, or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the plan.

9.08 **Payment of Statutory Fees.** All fees payable pursuant to Section 1930 of Title 28 of the United Sates Code, shall be paid on or before the Effective Date. All post-confirmation fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid as they become due.

9.09 **Modification/Amendment.** The Debtor reserves the right, in accordance with the Code, to amend or modify the Plan and related documents in any manner or revoke the Plan in it entirety prior to the entry of the Confirmation Order, upon such notice as the Court may required. After entry of the Confirmation Order, the Debtor may: (a) amend or modify the Plan and related documents in accordance with, and to the extent permitted by §§1127(b) of the Code, or (b) remedy any defect or omission or reconcile any inconsistency in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purpose and intent of the Plan, so long as it does not materially and adversely affect holders of claims or interests. In the event the Plan is confirmed but cannot be consummated, the Confirmation Order shall be revoked and upon such revocation, the terms of the Plan shall not be binding on or enforceable by any person.

9.10 **Notices.** Any notice required or permitted under the Plan shall be in writing and served either by (1) certified mail, return receipt requested, postage prepaid, (2) hand delivery, or (3) reputable overnight delivery service, freight prepaid, addressed to the following parties:

Stanocola Employees Medical and Hospital Association, Inc.
16777 Medical Center Drive, Suite 125
Baton Rouge, LA 70816

Steffes, Vingiello and McKenzie, LLC
Attorneys-at-Law
3029 S. Sherwood Forest Blvd., Suite 100
Baton Rouge, LA 70816

9.11 **Construction.** The rules of construction set for in §102 of the Code shall apply to the construction of the Plan.

9.12 **Section Headings.** The section headings contained in the Plan are for convenience and reference purposes only and will not affect in any way the meaning or interpretation of the Plan.

9.13 **Offer in Compromise.** The compromise embodied in the Plan shall not be deemed to be an admission of liability of the Debtor, and shall not be admissible in any proceeding or action, other than to enforce the provisions of the Plan, against the Debtor, as a Debtor and Debtor-in-Possession.

9.14 **Section 1123(a)(6).** The provisions of §1123(a)(6) of the Code are inapplicable in this Bankruptcy Case.

DATED:     April 10, 2002
By Attorneys for Stanocola Employees Medical and Hospital Association

**STEFFES, VINGIELLO AND MCKENZIE, LLC**
3029 S. Sherwood Forest Blvd, Suite 100
Baton Rouge, LA 70816
(225) 368-1006
(Fax) (225) 368-0696


/s/ Arthur A. Vingiello
Arthur A. Vingiello (#13098)

**Stanocola Employees Medical and Hospital Association, Inc.**
**Balance Sheet**
**For the Eight Months Ending February 28, 2002**

### Assets

| | |
|---|---:|
| Current Assets | |
| Cash and cash equivalents | ($60,090) |
| Accounts receivable - net | 1,777,003 |
| Inventory | 209,589 |
| Prepaid expenses | 194,705 |
| Total current assets | 2,121,206 |
| | |
| Property, Plant and Equipment | |
| Property and equipment - net | 423,012 |
| | |
| Other Assets | |
| Deferred compensation | 650,000 |
| Lease deposit | 6,634 |
| Total other assets | 656,634 |
| Total Assets | 3,200,852 |

### Liabilities and Net Assets

| | |
|---|---:|
| Current Liabilites | |
| Accounts payable | 2,914,773 |
| Accrued expenses | 553,939 |
| Pension liability | 361,129 |
| Deferred Revenue | 48,771 |
| Total current liabilities | 3,878,611 |
| | |
| Long-Term Debt | |
| Notes Payable | 859,228 |
| Capital leases | 172,440 |
| Total long-term debt | 1,031,668 |
| | |
| Other liabilities | |
| Deferred compensation | 650,000 |
| Total other liabilites | 650,000 |
| | |
| Net Assets | |
| Unrestricted | (2,359,426) |
| Total liabilites and net assets | 3,200,852 |

EXHIBIT C

**Stanocola Employees Medical and Hospital Association, Inc.**
**Income Statement**

**For the Eight Months Ending February 28, 2002**

|  | Current | YTD |
|---|---|---|
| **Revenue** | | |
| Gross member service revenue | $1,287,221 | $10,589,852 |
| Contractual Adjustment | (582,773) | (5,265,167) |
| Home health | 159,654 | 1,284,339 |
| Income from sales | 73,549 | 614,635 |
| Membership dues | 80,056 | 719,051 |
| Capitations | 64,584 | 527,656 |
| Other revenue | 20,197 | 810,107 |
| Total Revenue | 1,102,488 | 9,280,473 |
| | | |
| **Expenses** | | |
| Salaries, wages and contracted labor | 650,409 | 6,118,785 |
| Employee benefits | 95,625 | 763,343 |
| Operating supplies | 104,341 | 721,954 |
| Operating services | 122,418 | 1,034,295 |
| Professional services | 81,371 | 380,847 |
| Depreciation and amortization | 17,000 | 144,860 |
| Interest | 8,112 | 61,230 |
| Provision for bad debts | 3,678 | 24,556 |
| Other charges | 23,528 | 202,013 |
| Total expenses | 1,106,482 | 9,451,883 |
| | | |
| Excess of revenue over/(under) expenses | (3,994) | (171,410) |

EXHIBIT D

## Stanocola Employees Medical and Hospital Association, Inc.
### Monthly Projected Budget through October, 2002

| | February 2002 | March 2002 | April 2002 | May 2002 | June 2002 | July 2002 | August 2002 | September 2002 | October 2002 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Member Service | 1,295,000 | 1,500,000 | 1,475,000 | 1,450,000 | 1,474,000 | 1,425,000 | 1,544,000 | 1,424,000 | 1,574,000 | 13,161,000 |
| Contractual Adjustment | -608,650 | -705,000 | -693,250 | -681,500 | -692,780 | -669,750 | -725,680 | -669,280 | -739,780 | -6,185,670 |
| Home Health | 170,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 1,450,000 |
| Income from Sales | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 720,000 |
| Membership Dues | 88,500 | 88,000 | 87,500 | 87,000 | 86,500 | 86,000 | 85,500 | 85,000 | 84,500 | 778,500 |
| Capitations | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 585,000 |
| Other Revenue | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 198,000 |
| | 1,111,850 | 1,210,000 | 1,196,250 | 1,182,500 | 1,194,720 | 1,168,250 | 1,230,820 | 1,166,720 | 1,245,720 | 10,706,830 |
| | | | | | | | | | | |
| Salaries & Wages | 680,000 | 755,000 | 730,000 | 755,000 | 730,000 | 755,000 | 755,000 | 730,000 | 755,000 | 6,645,000 |
| Benefits | 100,400 | 100,400 | 100,400 | 95,400 | 95,400 | 90,400 | 85,400 | 80,400 | 80,400 | 828,600 |
| Operating Supplies | 100,000 | 106,000 | 106,000 | 106,000 | 106,000 | 106,000 | 106,000 | 106,000 | 100,000 | 942,000 |
| Operating Services | 110,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 130,000 | 1,150,000 |
| Professional Services | 44,265 | 44,265 | 44,265 | 44,265 | 44,265 | 44,265 | 44,265 | 44,265 | 44,000 | 398,120 |
| Depreciation & Amortization | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 153,000 |
| Interest | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,300 | 8,300 | 8,300 | 8,100 | 75,500 |
| Bad Debts | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 27,000 |
| Other Charges | 28,300 | 28,300 | 25,600 | 25,600 | 25,600 | 25,600 | 25,600 | 25,600 | 25,600 | 235,800 |
| | 1,091,465 | 1,192,465 | 1,164,765 | 1,184,765 | 1,159,765 | 1,179,565 | 1,174,565 | 1,144,565 | 1,163,100 | 10,455,020 |
| | | | | | | | | | | |
| Net Income/(Loss) | 20,385 | 17,535 | 31,485 | -2,265 | 34,955 | -11,315 | 56,255 | 22,155 | 82,620 | 251,810 |

## Stanocola Employees Medical and Hospital Association, Inc.
### Projected Annual Budgets

### Through October 2003

| | |
|---|---|
| Gross Member Service | 17,550,000 |
| Contractual Adjustment | -8,248,500 |
| Home Health | 1,958,400 |
| Income from Sales | 1,162,800 |
| Membership Dues | 1,000,000 |
| Capitations | 792,000 |
| Other Revenue | 275,000 |
| | 14,489,700 |
| | |
| Salaries & Wages | 9,150,000 |
| Benefits | 1,079,700 |
| Operating Supplies | 1,280,000 |
| Operating Services | 1,675,000 |
| Professional Services | 530,000 |
| Depreciation & Amortization | 220,000 |
| Interest | 108,000 |
| Bad Debts | 36,000 |
| Other Charges | 307,200 |
| | 14,385,900 |
| | |
| Net Income/(Loss) | 103,800 |

### Through October 2004

| | |
|---|---|
| Gross Member Service | 18,375,000 |
| Contractual Adjustment | -8,636,250 |
| Home Health | 2,050,000 |
| Income from Sales | 1,250,000 |
| Membership Dues | 875,000 |
| Capitations | 675,000 |
| Other Revenue | 375,000 |
| | 14,963,750 |
| | |
| Salaries & Wages | 9,400,000 |
| Benefits | 1,109,200 |
| Operating Supplies | 1,290,000 |
| Operating Services | 1,700,000 |
| Professional Services | 550,000 |
| Depreciation & Amortization | 220,000 |
| Interest | 108,000 |
| Bad Debts | 50,000 |
| Other Charges | 307,200 |
| | 14,734,400 |
| | |
| Net Income/(Loss) | 229,350 |

**EXHIBIT F**

Stanocola Employees Medical and Hospital Association, Inc.
Statement of Cash Flows
Monthly Ending October, 2002

| | February 2002 | March 2002 | April 2002 | May 2002 | June 2002 | July 2002 | August 2002 | September 2002 | October 2002 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from operating activities:** | | | | | | | | | |
| Revenues over expenses | 20,385 | 17,535 | 31,485 | -2,265 | 34,955 | -11,315 | 56,255 | 22,155 | 82,620 |
| Depreciation | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Current Liabilities | -16,600 | -16,600 | -16,600 | -16,600 | -16,600 | -16,600 | -16,600 | -14,100 | |
| Net Cash provided by operating activities | 20,785 | 17,935 | 31,885 | -1,865 | 35,355 | -7,915 | 59,655 | 28,055 | 102,620 |
| | | | | | | | | | |
| **Cash Flows from investing activities:** | | | | | | | | | |
| Property and Equipment | | | | | | -2,000 | -2,000 | -2,000 | -2,000 |
| Liquidation of 457 Funds | | | | 600,000 | | | | | |
| Net Cash provided by investing activities | | | | 600,000 | 0 | -2,000 | -2,000 | -2,000 | -2,000 |
| | | | | | | | | | |
| **Cash Flows from financing activities** | | | | | | | | | |
| Priority Claims | | | | | | | -2,083 | -2,083 | -2,083 |
| Executory Contracts | | | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 | -8,000 |
| Administrative Claims | | | | -250,000 | | | | | |
| Convenience Class | | | | | | | -70,000 | | |
| Unsecured Creditors | | | | | | | | -250,000 | |
| Lease Payments | -7,100 | -7,100 | -7,100 | -7,100 | -7,100 | -7,100 | -7,100 | -7,100 | -7,100 |
| Notes Payable | -14,000 | -14,000 | -14,000 | -14,000 | -14,000 | -11,000 | -11,000 | -11,000 | -11,000 |
| Net Cash provided by financing activities | -21,100 | -21,100 | -29,100 | -279,100 | -29,100 | -26,100 | -98,183 | -278,183 | -28,183 |
| | | | | | | | | | |
| Net Change in Funds Available | -315 | -3,165 | 2,785 | 319,035 | 6,255 | -34,015 | -40,528 | -252,128 | 72,437 |
| | | | | | | | | | |
| Beginning Cash Balance | -7,574 | -7,889 | -11,054 | -8,269 | 310,766 | 317,021 | 283,006 | 242,478 | -9,650 |
| | | | | | | | | | |
| Ending Cash Balance | -7,889 | -11,054 | -8,269 | 310,766 | 317,021 | 283,006 | 242,478 | -9,650 | 62,787 |

**EXHIBIT G**

Stancocia Employees Medical and Hospital Association, Inc.
Statement of Cash Flows

## For 12 Months Ending October, 2003

| | |
|---|---:|
| Cash Flows from operating activities: | |
| Revenues over expenses | 103,800 |
| Depreciation | 220,000 |
| Current Liabilities | |
| Net Cash provided by operating activities | 323,800 |
| | |
| Cash Flows from investing activities: | |
| Property and Equipment | 50,000 |
| Net Cash provided by investing activities | 50,000 |
| | |
| Cash Flows from financing activities | |
| Priority Debt | -25,000 |
| Executory Contracts | -12,830 |
| Unsecured Debt Payments | -100,000 |
| Lease Payments | -83,000 |
| Notes Payable | -126,000 |
| Net Cash provided by financing activities | -346,830 |
| | |
| Net Change in Funds Available | 26,970 |
| | |
| Beginning Cash Balance | 62,787 |
| | |
| Ending Cash Balance | 89,757 |

## For 12 Months Ending October, 2004

| | |
|---|---:|
| Cash Flows from operating activities: | |
| Revenues over expenses | 229,350 |
| Depreciation | 220,000 |
| Current Liabilities | |
| Net Cash provided by operating activities | 449,350 |
| | |
| Cash Flows from investing activities: | |
| Property and Equipment | -150,000 |
| Net Cash provided by investing activities | -150,000 |
| | |
| Cash Flows from financing activities | |
| Priority Debt | -25,000 |
| Unsecured Debt | -100,000 |
| Lease Payments | -20,500 |
| Notes Payable | -126,000 |
| Net Cash provided by financing activities | -271,500 |
| | |
| Net Change in Funds Available | 27,850 |
| | |
| Beginning Cash Balance | 89,757 |
| | |
| Ending Cash Balance | 117,607 |